et al. Oral argument of the 16-minute exercise between Howard, Brady, and Ellen. I'd like to reserve three minutes for rebuttal. Good morning. May it please the Court, I am Raquel Howard, representing Oscar Santiago in this appeal of the District Court's decision granting summary judgment to the defendants. The Court erred because there are genuine issues as to material facts regarding both the objective and subjective components of Santiago's Eighth Amendment claim. Now, although I will address the objective component, I think that the primary issue here, the real question, is whether there are genuine issues as to material facts regarding the subjective prong or whether there was deliberate indifference. And this all pertains to the delay in giving your client the recommended treatments? Yes, Your Honor. This case truly starts when they send him to a dermatologist, a medical expert, asking for a diagnosis and treatment plan. And when they got it, they disregarded that recommendation knowing that Mr. Santiago was wheelchair-bound, that he was experiencing debilitating pain and swelling, and was unable to walk for nearly a month. Now, the dermatologist recommended three treatments. One was a topical steroid. Another was compression hose. And the third was potassium iodide, which is referred to in the record as SSKI, which was recommended to reduce the size of the nodules and the swelling up under his skin. Now, there is no question that the recommended treatment was delayed. If I can just ask you a question just a little bit before time and with respect to that. Yes. I mean, it does seem like they were being pretty conscientious, at least, up until the point of implementing the recommendations. I mean, they, you know, he had gotten a lot of attention. They had sent him to OSU Medical Center. I mean, there's not much smell of indifference in the air, at least up until the point you're discussing now. Is that fair? Well, yes. As we, as I stated in the brief, we don't dispute his medical care prior to get the recommendation for proper treatment. But then, don't we have to consider the fact that even that he had had this other treatment up to that date and what we've got February 20 to March 17 in that time frame, it wasn't as if there was no treatment during that time frame. Isn't that correct? Can you restate the time frame? Yeah. The February 20 to March 17 time frame, which is really the time at issue, correct? Right. Okay. So during that time frame, the complaint is that they were indifferent, deliberately indifferent to his needs. Absolutely. But I'm struggling to understand. I understand the SSKI was not provided, but my look at the record indicates that during that time, he was receiving anti-inflammatories, anti-ulcer drugs, Tylenol, Benadryl. So it's not as if they stopped any treatment. It's just your whole case hinges on the delay in getting the SSKI. Is that correct? Well, it's actually a delay in all three treatments because, and I want to point to something specific, the treatments were recommended on February 20th. And Mr. Santiago states that he was spoke with Dr. Ringel, who's the medical director that day, and was told that those recommended treatments would be prescribed. Now, what we see is a seven day delay between that recommendation and when Dr. Mosher signed off on the recommendation. The time that Ringel was on vacation. Well, I think that that is something that's unclear as well. Actually, when he went on vacation, because the appellees argued that there's no way that Mr. Santiago could have talked to him on the 20th because he was on vacation. But obviously, Mr. Santiago has pleaded and also has asserted in his grievances that he did talk to him about that recommended treatment. Now, yes, they argued that he was on vacation during that time. We know from the grievance responses that when Dr. Ringel is out of the facility, then Dr. Mosher is to take over in her position at that time as assistant medical director. Let me just, I'm sorry, go ahead and finish your answer. Well, the point is, that's one of the issues that we're disputing. Why did it take seven days to even sign off on the treatment when treatment was readily available? There is an argument- The IAEA was a non-formulary to be ordered. It was not readily available. Well, I was going to sort of separate that because that is a separate issue on its own. But as far as the topical steroid, which is different than Benadryl, and the compression holes that were recommended, there was no sense of urgency in prescribing those recommended treatment, although there was urgency in sending him to the dermatologist to get a diagnosis and to get a recommendation for proper treatment. Doesn't the record reflect that Dr. Mosher didn't find out that these recommended prescriptions were not signed until I think February 25 or thereabouts? And then she went ahead and signed for the prescriptions on February 27. So just a two-day delay, if I'm correct, in her signing them. Am I correct about that? Well, I'm not sure that the record reflects that she knew about it on February 25. Is there anything in the record that reflects that she knew before that these recommendations made by the OSU dermatologist on the 20th, which apparently went unsigned, were in fact unsigned? Because the nurses- It seems like what happened here is Mr. Santiago began asking questions on the 22nd, the 23rd, 24th, and 25th, that what's happened to these three orders, the ointment, the compression hose, and the SSKI. Nurses looked into it, found that the recommendations had not- They were in the medical records, but had not been signed, as I understand, the uncontroverted record, told Dr. Mosher, and two days later, she signs. So is there any dispute in the record about her role? Well, I think that the dispute actually comes from her affidavit. When the court issue its first decision and says, hey, you haven't told us why there was this seven-day delay. What Dr. Mosher states in her second affidavit is that I did not sign off on these prescriptions because I was waiting to see, one, if the Benadryl was going to be effective, and two, she said that the compression hose would cause more discomfort than he was suffering at that point in time. So I feel like that's direct evidence that she knew during that time and she had considered and not signed off on that prescribed treatment. However, even her assertions in that affidavit are not supported by the medical record. She says that she was considering whether the Benadryl would work, and they also assert in their motion of reconsideration that he was receiving Benadryl. All I see in the medical documentation is a Benadryl prescription from October of 2007 that was a 90-day supply, which means that during the course of what we're talking about here, that would have expired. I don't see anything else in the medical documentation that says that he was receiving Benadryl. I thought there was something in the medical records. I'll check from February 11, indicating that Dr. Ringel had prescribed the wheelchair, the cane, the anti-inflammatory medication, the Tylenol, and the Benadryl. But I will check the record. They do cite, the appellees cite to the record, I believe at 18-5, and upon my review, I see that. So here, going back to the point that Judge Strange sort of brought out in regards to the SSKI, now, in regards to that medication, the appellees assert the fact that it's a non-formulary medication, and Dr. Mosher, or excuse me, Director Dr. Ringel is the only person that can seek approval for it. Now, in, there was a 14-day delay. There was a delay between the recommendation and when he sought approval for the medication. This whole time, Mr. Santiago is still wheelchair-bound. He's still suffering from pain and the intense swelling that's preventing him from walking unassisted. Now, what they have said in the response to his grievances, and also in the appellee's original motion, is that he wanted to research the medication because he was not familiar with it. Now, it doesn't take 14 days to do that, especially considering the fact that the patient, at that point in time, was wheelchair-bound. Does the record reflect that Dr. Ringel got approval for the SSKI and ordered it on March 5? It just didn't come until the 17th? The record reflects that he did seek approval on March 5th, and that it was ordered, and he received, he was, Mr. Santiago actually received the medication on March 17th. So Dr. Ringel did his part. He did what he could do as of March 5th, and it was just a matter of... He did that 14 days after the recommendation was made. I understand. Right. I understand. My understanding on that, Counselor, is that your argument is that it was deliberately indifferent because the purpose was to save money, and I guess when I'm looking at that from the overarching view, I don't understand that argument because they've sent him to multiple specialists at specialized facilities out of where he is incarcerated. They've gotten the wheelchair. They've expended a lot of money. Why would it indicate deliberate indifference not to spend something on a topical ointment when you're spending all this other money on him at the same time? I don't think that, although we suggest that a jury could come to the conclusion that the treatment was delayed, that's not our main argument. Our argument is we don't know why it was delayed, and there are genuine issues as to what their state of mind was in delaying, in particular for Dr. Mosher, delaying the topical ointment and the compression hose because on the one hand, what we see is her saying, well, I was trying to see if these other treatments would work, and on the other hand, we have a response to the fact that one of the grievances that he filed saying that there was a backlog in patients. So that creates a genuine issue of material fact regarding whether her affidavit is credible, and that's something that the Shrier effect... It couldn't be both? I'm sorry? And it couldn't be both? Well, here's the thing. The recommendation came in on February 20th. It was obviously urgent enough for them to send him to the dermatologist and ask for a recommendation and ask for a treatment plan, and when they got that information back, it was disregarded. All of a sudden, Mr. Santiago's condition was not important enough to pay attention to at that moment, although he was wheelchair-bound. He was suffering from pain and intense swelling. But is there any indication that Dr. Ringel purposefully evaded or avoided ordering the SSKI and the ointment and compression hose for any sort of improper reason, to save money, whatever it might be, that he had so-called mens rea, I suppose, in terms of not wanting to provide appropriate care to Mr. Santiago? Well... Because the record seems to reflect that, essentially, he wrote out this order and then went on vacation and then got back and first learned that there was this delay on March 3 and then ordered the SSKI on March 5. Well, just as a correction, I don't believe that the record reflects that Dr. Ringel actually wrote the order or signed off on the order. But what we have is Mr. Santiago having a conversation with Dr. Ringel. Dr. Ringel says... And this was a conversation that was had when his sutures were being removed because he had a biopsy done to appropriately diagnose the condition. We have them having this conversation saying, yes, the prescriptions will be ordered. You'll have them in a couple of days. And then we don't have an affidavit from Dr. Ringel to say, you know, this is what happened and I had to scoot or I had this conference to go to and this is what was supposed to happen in my absence. What we see is a response back to Mr. Santiago's grievance, saying that Dr. Ringel was out of town. Now, and this has happened in cases before and the Sixth Circuit has looked at this before. In Scott v. Ambani, it was a situation where an inmate had leg pain, back pain, testicle pain and had a previous cancer diagnosis. The doctor was aware of the diagnosis but did not provide medication to treat it because he said he didn't have time to examine the prisoner at that point in time. Now, the court in that case said that there are genuine issues as to material facts regarding the delivered indifference and giving those facts that the doctor said that he didn't have time, that a jury could reasonably decide that there was delivered indifference in that case. Okay. Your initial time has expired. Thank you. You'll have your rebuttal time. Thank you. Your Honors, Debra Gurrell Worley on behalf of Drs. Ringel and Dr. Mosher, may it please the Court. This case is not one of deliberate indifference or even one of delay. It is one of where an inmate wanted a certain medication he learned during a follow-up visit with a dermatologist as recommended by OSU through the Corrections Medical Center. He wanted a medication that he heard he could get to. There is nothing in the record, Plaintiff's Counsel indicated, that Benadryl wasn't the same as the topical medication. There's nothing in the record that there's any difference. They placed nothing in the record about that. There's nothing in the record that Dr. Ringel was even present and made these statements. To the contrary, the evidence which was placed in by the defendants that he wasn't there on that day, and that was in the grievance document that was attached. He wasn't even there, and Mr. Ringel was told, there's no way that statement is accurate because Dr. Ringel wasn't in the House that day, in the institution. Are you arguing there are disputes of material fact? No. I'm saying that he wasn't there. He didn't say it. That's in the record. They didn't put anything in there other than his averments. And other than that, and I think that's why the— We have to, at this stage, take his averments as correct? I guess. Then if he was there, I mean, it's not a genuine issue of fact. It would be something that the jury could go to the jury on. I mean, that's—the issue before this case is whether there was a delay in providing this medication, SSKA, or, I guess, ordering it. First of all, there's nothing in the record at all that this expectorant medication would— What would it do? How would it help? It's not an analgesic. There's nothing in the record about it being a pain reliever. The only thing in the record is it's an expectorant. It's an expectorant that helps—that thins mucus secretions and helps somebody cough up mucus secretions easier. That's what this medication is, and that is in the record by Dr. Mosher. She put that in the record exactly what it was. Further, what is in the record and has not been touched upon by the plaintiff is that the rash, erythema nodosum, it's a rash condition. How you treat the rash is you—it bides its time, but what's more important and what's more significant is the underlying conditions that can be indicative of this rash. That's why they sent him on so many consults to make sure that they were addressing anything of life-threatening nature that this rash could be indicative of. In fact, if you go to the very consult request, which was record 18-11, that plaintiff relies so heavily on, you can tell that the consulting dermatologist is not really—he's not focused on the rash, erythema nodosum. What this doctor is concerned about is the leg edema, and that's why he doesn't just recommend the treatments. He doesn't just recommend the Trimacolone topical. He doesn't just order the compression hose. He doesn't just order the SSKI. He orders other things, and he says here, he says that the legs are elevated up to the And he makes a medicine consult. He wants to know why the legs are swollen. And after his concern about the legs being swollen, not the rash, which seems to be almost a red herring in this matter. He wants to check for proteinuria versus congestive heart failure, as it is not a classic sign for erythema nodosum, and that is something that they ordered immediately because that's what the doctors are concerned about. Is this guy having proteinuria? Is he taking fluid? Is fluid leaving his vascular system and going out into the tissues, which may be a cause for the leg edema? Further, he says in his consult, which is relied so heavily on, he says that there's no fevers, there's no chills, there's no nausea, vomiting, there's no shortness of breath, which was linked directly to the SSKI because that's what SSKI is for, is to get water that's out of the lungs. And if there's an osmotic problem going on with a person letting water go into the leg tissues, it might also go into the lung tissues, and that's why the doctor is making a recommendation for this, should it rise to the fact that water is going into the lung. They're looking at life-threatening things. There's absolutely nothing in the record. There's nothing in the record that indicates SSKI relieves pain or is for any other use than an expectorant. I think plaintiff's counsel tried to say what SSKI was used for in their opinions, but they placed nothing in the record about that. The only thing in the record at this juncture is that erythrocema nodosum is a concern, but what is really a concern is the underlying figures. And that is what... Did I miss the... No. No. We never placed anything in the record, and they placed nothing in the record, so there couldn't be anything in the record about the cost. That wasn't the concern. And if you can look, again, at this, what is in the record, 18-11, is the doctor orders it to be BID or twice a day, up to three times daily, up to. That means if it's necessary. If he's starting to have problems where he needs to expectorate secretions out of his air. I submit to the court what the record reflects is when this came back on the 20th, these consults, what they immediately did is had him check for proteinuria and started looking at possible cardiac problems, and there was no need for the SSKI. There was no need because he had no shortness of breath, as verified by this record. He had no complaints of any problems breathing. And obviously, the edema was sticking to his lower extremities and hadn't progressed up. Plano's counsel keeps saying that we sent him there to be diagnosed for EN or erythrocema nodosum. He had already been diagnosed with that. Why would we send him there for that? We were sending him to the dermatologist so that his rash could be evaluated and to see if there was anything else. What is in the record is they ultimately did more treatments because the doctors at the correctional facility, we have to take care of the whole patient. We just don't deal with one thing at a time. We can't just deal with a rash. We have to deal with the whole patient. He was already on Benadryl, and he was on Benadryl, and the doctor put that in her affidavit. She wanted to see if that would work for us instead of just abruptly switching him back and forth. That's a clinical judgment that the doctor made and is at her discretion. For the hose, it was put in there. We don't want to squeeze. His legs are already edematous. The concern with the dermatologist is, you know, keep the edema down. Keep the legs elevated. That's what we did. That's what's ordered. That wasn't one of the reasons for the wheelchair so he could put the little leg stands up and keep his legs elevated. You don't want to put compression hose squeezing already edematous legs. I mean, it's just that was a clinical judgment call that the doctors made on behalf of Mr. Santiago. The question is not why we did not prescribe the expectorant. The question is, ultimately, why did we? Was it to pacify this inmate? How many doses does he take? There's nothing in the record of this. In fact, when I first filed my motion for summary judgment and the plaintiff who was then pro se filed his memo in op, he didn't file any evidence. He didn't put anything in the record. He didn't point to one medical record even though he had been given two complete full sets of medical records. He just then decided to bring up issues of discovery disputes. There was nothing in the record and at some point in time there was a question of why didn't we show this and why didn't we show that? Once it was pointed out that the defendants didn't have to prove a negative in this case and the court reevaluated, the district court reevaluated his earlier decision, he found that it was erroneous and unjust. There was no need for this erythrothema nodosum for the SSKI. The other medications that were ordered, it wasn't appropriate at that time. That's why this is a recommendation and not a prescription. No point in time was this medicine prescribed prior to March 5th. Then again, it was prescribed pursuant to policy. It was non-formulary. It was non-life-threatening, a non-emergent medication. You have to go through an approval process. We can't stock every medication that's out there for inmates. The state just can't do that. In fact, this court mentioned that in one of his earlier decisions. I think the screening decision. We have to stock what is medically necessary for these inmates, but Dr. Ringo went ahead and ordered it and got it timely. It was pursuant to policy and procedure and we put that out there. Now they're saying that is a question of fact because in fact, Mr. Santiago, never in his complaint said that this was outside of the policy or procedure manual or standards. He never says that at all. They had time once they became representing Mr. Santiago in this case. The court allowed extra discovery time. They could have asked for this policy and procedure if they thought there was a question that we were violating it, but we weren't. It took a while to get it and once he got it, he gave it to me. In fact, though, if you look on March 3rd, Dr. Ringo comes in and he sees the recommendation and he must have evaluated the patient and seen he's obviously not having problems breathing, so he discontinued that at that time. Then on March 5th, for whatever reason, the record is absent, the evidence is absent as to why he did it, but he did it and it was prescribed. There's no delay here. It's a medication that was prescribed by the doctor at a time he obviously felt it was appropriate. Prior to that, not only is there no mention within any of the medical records, there's no mention by plaintiffs how this would have, how was this, there's no verifying medical evidence how this expectorant would have positively affected Mr. Santiago. We do know that the OSU dermatologist prescribed it. No, he did not prescribe it. Or recommended it. Yes, it's a recommendation and these recommendations come back to us all the time. Maybe you want to think about this, maybe you want to think about that, because they're looking at one organ of a person or they're looking at one condition. What did Dr. Mosher do on February 27th? She signed the order for the SSKI as well? She cannot. I know it's got to be approved by the medical director, but does she further recommend it? No, I wouldn't. What did she do? She prescribed the other medications, the ones that didn't. She ordered those. The hose and the ointment. Yes, along with, I think prior to that though, if you look at it, what was going on already was they were checking for the protein urea in his urine and whatnot to make sure that that wasn't a condition going on. And then she did, she put into place his compression hose, but even then, it wasn't warranted at that time. His legs were still edematous. And as she put in her declaration. And further, she wanted to try the Benadryl that she had commenced. And we really don't know why Dr. Ringel did not take action between, I guess, February 20 and March 3 when, I guess, he signed the order. When he discontinued it? Well, there is in the evidence that he- We do know he was on vacation or something. Yes. He was not, according to the grievance, when Mr. Santiago grieved this, they looked into it and it was told to Mr. Santiago that he was not physically present in the building, in the institution on February 20 when Mr. Santiago returned from his consult. So he wasn't there, but really, I think that is- I think your argument would be, at least in part, that there's just nothing in the record that would show a culpable state of mind that he had any, I guess you're making that argument, any intent to be indifferent or occasion harm to Mr. Santiago, that he- I've never seen a record where an inmate has received more attention for a rash condition than Mr. Santiago. I think beyond- There's no question that these people were trying to- They admitted him, they observed him, they gave him pain medication, they gave him anti-itch medication, they treated any possible rheumatology, dermatology, pulmonary, I mean, anything that could potentially be wrong with this person, they checked on him. So, your time's almost up, but tell me about Dr. Mosher's role, because it seems that she really just had about a two-day window, according to the record, where she really kind of learned about the fact that no order had been signed, a recommendation, whatever you call it, and on the 27th, when she signed, whatever it is that she signed, for the hose and the ointment and for maybe the SSKI to go through the approval process. The court is correct. She was aware that it hadn't been put into place because I believe Mr. Santiago was complaining about it. But then she also, as I put into her- had her submit a declaration, was that it wasn't appropriate to implement it prior to when it was implemented, those other two. And she had no control over the SSKI. I know your time has expired, but I know you make much of the fact that this is just a recommended medication and a mucus thinning agent, but it- I mean, the case law does seem to suggest that the interruption in any sort of prescribed course of treatment could give rise to a claim for an Eighth Amendment violation. I'm not saying that that's the case here, but I don't know that the fact that it's recommended, you know, versus required is the biggest distinction. There is case law, Your Honor. I can't- I know I put it in my brief- Yeah, I've seen your case law. And it's- the difference- there's a difference between interrupting a prescribed course of treatment and something that's recommended. It's recommended to come back for two things. Should it be implemented and prescribed, and if so, when? Right. And this was prescribed. It was not prescribed until Dr.- Dr. Ringel was the only one that could- So your argument is he actually prescribed it on the- Fifth. Yes. And it was recommended on the 20th by the dermatologist. On the 20th by the dermatologist at, I think, CMC. And then- Okay. I think we get your argument. Thank you so much. Thank you. Ms. Howard? Yes. Just a few points. It seems as though that counsel for the appellees is providing her own expert medical testimony regarding the clinical reasons for the dermatology consult and what happened after. None of that information is contained in the affidavits that- well, I won't say none of that information, but a lot of those details that she gave about other conditions that are not relevant to this appeal today are not provided- we're not provided with anything by form of affidavit that supports what she just said. I would assume the medical records would have shown, if they were doing a urinalysis, for example, to determine causes of edema, the fact that there was a urinalysis and the results of that would be in his medical records, correct? I'm not sure that's part of the record in this case, though. I could be mistaken on that, but I don't think so. It may be contained in his complete medical file, but still here, we don't have anything from Dr. Mosher or Dr. Ringel saying that this is what our priority was at the time, and Dr. Mosher had the opportunity to do that by way of affidavit. It still doesn't change the fact that there are genuine issues of material fact and dispute regarding the seven-day delay between the recommendation and Dr. Mosher signing off on it. And I do want to point out that you asked Apelli's counsel whether she signed off on all of the treatments, and she did. We cite to this in our brief. She signs off on the recommended treatments, all three, and makes the notation monitor patient for SSKI. That gives us the inference there is maybe she did have the authority to do so, especially considering the fact that Dr. Ringel was not at the facility, was on vacation. What procedure do they have in place in order to make sure that things get done when Dr. Ringel is not there? The other thing that we see in a response to one of Mr. Santiago's grievances is that they say that Dr. Ringel handles everything that he can while he's there. And when he leaves, Dr. Mosher and there was another assisting physician, they're responsible for making sure that things are done in his absence. There we have, again, a genuine issue of material fact that is very pertinent in deciding whether they disregarded the substantial risk that he was going to continue to be wheelchair-bound to suffer for nearly a month until he received the SSKI. Now in reference to SSKI being an expectorant, even Dr. Mosher says in her affidavit that there is evidence that it could be beneficial for this to treat the underlying symptoms of erythema nodosum. Now, she probably is not in a best position to know whether it is the best treatment for Mr. Santiago. The dermatologist is probably in the best position to know that. And that's what they recommended. I would also, I believe, and I hope I'm not mistaking on this, but it seems as though the appellee said that Dr. Ringel must have evaluated Mr. Santiago and determined that it wasn't necessary before he left on vacation. If I'm mistaken on that, then I do apologize. But that's the opposite of what they argue in their brief. And again, it gives us a genuine issue of material fact. And summary judgment is not appropriate in this case. That's why we're asking the court to overturn and remand it to proceed with a trial by jury. Thank you. Thank you, Ms. Howard and Ms. Goral-Werley.